IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 20-29-BLG-SPW |
| Plaintiff, | |
| vs. | |
| DAVID SHANE LINDELL, | ORDER |
| Defendant. | |

Before the Court are Defendant David Shane Lindell's pretrial motions.
(Doc. 22).  Lindell requests suppression of evidence obtained from a search of
Abby Douglas's Chevy Trailblazer, moves to exclude testimony regarding events
on March 17, 2020, and moves to exclude testimony and evidence surrounding
Lindell's past conviction and probationary status.  (Doc. 22 at 9, 11, and 16).  On
December 4, 2020, the Court held a hearing regarding the motions and each party
presented testimony.  After considering the testimony, exhibits, and briefing, the
Court grants in part and denies in part Lindell's motions for the following reasons.

1

## I. Background

### A. March 17, 2020

The parties did not present testimony on the events of March 17, 2020, so the facts, for the purposes of this order, are taken from the parties' briefing. The Court also notes that each party's briefing has many seemingly inconsistent, incorrect, and confusing dates, with the described incidents taking place in March 2010, 2018, 2019, and 2020 depending on the paragraph. The Court assumes that the information in the indictment and testified to at the hearing is the correct date and that the relevant events occurred in March 2020.

David Lindell and Abby Douglas, Lindell's then-girlfriend, rented a room at the Western Inn Motel in downtown Billings on March 17, 2020. Later that day, David and Usha Kahn, the managers of the motel, evicted Lindell and Douglas after seeing multiple unauthorized guests enter and exit the room. This escalated into a dispute over $400 Lindell and Douglas believed the motel owners had stolen.

During the argument—according to the Kahns—Lindell threatened to shoot them and gestured to his waistband, which they interpreted as a signal that Lindell was armed. David believed he actually saw a firearm, while Usha only suspected that Lindell was armed and did not actually see a gun. Usha called the police and

2

Lindell and Douglas left after the Kahns informed them police were on their way. Lindell and Douglas departed in a Chevy Trailblazer.

Some of these events were apparently captured on video surveillance, but some of the recording was deleted and the rest lacked enough picture quality to discern whether Lindell had a gun. However, video did confirm the basic facts of the confrontation, including the argument and Lindell's departure. After speaking to the Kahns about the incident and alleged threats, Billings Police Department Officer Travis Smith put out an Attempt to Locate notice for Lindell and Douglas. The notice stated Lindell was armed. Lindell denies that he was armed that day.

*B. March 18, 2020*

The following facts were testified to at the hearing on December 4, 2020. On the morning of March 18, 2020, Billings Police Department Officer Stovall learned that an arrest warrant had been issued for David Lindell, in connection with an alleged assault the previous evening. Stovall, who had dealt with Lindell on other occasions, drove to Lindell's mother's home, located off Orchard Drive, looking for Lindell. Upon arriving at the residence, Stovall saw Lindell unloading items from the passenger side of a White Chevy Trailblazer, later confirmed to belong to Douglas. After identifying Lindell and matching him to the department's description, Stovall handcuffed Lindell and took him into custody. It is unclear

3

exactly when, but Stovall testified that he looked into the Chevy and observed what he believed to be the black rubber grip of a pistol. At some point, officers moved Lindell to the back of a police car. After other officers arrived, Stovall and the other officers went to find Douglas.

The officers asked Tammy Rutschke, Lindell's mother and the owner of the residence, for permission to enter and search the house for Douglas. Rutschke allowed the officers to come inside after warning her sleeping husband. She observed the officers as they searched the home. Stovall and the officers found Douglas in the bedroom where they grabbed and handcuffed her. According to Rutschke, the officers roughly accosted Douglas and Rutschke, upset, reprimanded them for their rough treatment. The officers led Douglas outside and placed her in the backseat of a car, adjacent to the car Lindell was placed in.

The parties presented conflicting testimony on the sequence of the next several events. According to Stovall, the officers uncuffed Douglas, obtained oral consent from her and then searched her vehicle. The officers did not memorialize the consent in writing immediately because they did not have a consent form. Stovall said he had run out of the forms and that none of the other officers on scene had a consent form either. While searching the vehicle, the officers saw a rubber handle of what appeared to be a pistol sticking out of a backpack on the passenger

4

seat. After seeing the gun, they paused the search and waited for ATF Agent Feuerstein to arrive.

Feuerstein was summoned to Rutschke's home by U.S. Deputy Marshal Wollschlager, who informed Feuerstein that officers had found Lindell and located a firearm in the car after getting consent from Douglas. Feuerstein, who was aware of the incident at the motel the previous evening, drove to the house. When he arrived, he pulled in behind the driver's side of Douglas's Chevy and noticed a U.S. Marshal speaking to a woman, who he later identified as Douglas. Feuerstein and Stovall went over the ATF consent form with Douglas and had her sign it. Feuerstein testified that he interjected several times to ensure that Douglas understood the scope of her consent. After receiving Douglas's written consent, Feuerstein walked to the vehicle and cataloged the gun and searched the backpack, where he found another gun inside. Feuerstein identified the guns as a Ruger revolver with a black rubber grip and a semi-automatic .380 pistol with an accented emblem on the grip.

Lindell testified that he did not see the officers speak to Douglas at length or have her sign anything prior to searching the Chevy, but he qualified that statement because he had an obstructed view from the back of the car he was placed in. Lindell was approximately 15 feet from Douglas and the officers after she was brought outside.

5

Rutschke, however, was more certain that Douglas did not consent.  She

testified that, after the officers arrived, some of them went inside to look for

Douglas and others immediately began searching the Chevy.  She accompanied

five or six officers inside the home and observed them "roughly" grab Douglas,

pushing her against a bedframe to cuff her.  Back outside, Rutschke observed the

officers place Douglas in a separate car from Lindell while waiting for Feurstein's

arrival.  She testified that the incident lasted for approximately 30 minutes and that

officers were searching the car the "whole time".  Douglas did not testify.  The

ATF consent form is signed and dated by Douglas, but it is almost entirely blank

aside from the signature.  The part of the form indicating what objects are to be

searched was left empty.

## II. Analysis

### A. *Suppression of evidence found during the search of the Chevy is unwarranted because Douglas consented to the search*

Defendant argues that Douglas did not give oral consent for the search of the

Chevy prior to the search and seemingly contends that the signed consent was not

freely given.  Defendant and Rutschke testified, each saying they did not see a long

enough conversation between Stovall and Douglas for Douglas to consent to the

search.  Rutschke testified that the search began prior to officers finding Douglas

inside the house.  In response, the government argues that Douglas gave oral

consent prior to the search and then memorialized her consent by signing the ATF form.  Officers testified that Stovall and Feuerstein each discussed the scope of the proposed search and her consent with Douglas prior to the search and prior to her signing the form.

The Court finds the government witnesses' testimony, combined with the signed ATF consent form, to be more credible and finds that Douglas consented to the search of the Chevy.  Officer Stovall and Agent Feuerstein each stated that they received informed consent from Douglas; Stovall personally received verbal consent and both witnessed Douglas sign the consent form afterward. Additionally, Deputy U.S. Marshall Wollschlager told Feuerstein that Douglas had verbally consented to the search when he was called to the scene.  Defendant has not argued that Douglas did not sign the form—the name on the signature line is plainly hers.  While Rutschke denies that officers sought Douglas's consent prior to searching, her testimony on that issue is uncorroborated and part of her testimony conflicted with the Defendant's own account.  For example, Rutschke claimed that her son was on an entirely different side of the vehicle than the other two witnesses at the scene testified to.  She also asserted that Defendant was forced to kneel handcuffed in the snow for 30 minutes, while Defendant testified that he was put in a car shortly after being handcuffed.  Furthermore, Rutschke asserted that Douglas did not sign a form or talk to officers long enough to do so, despite

the uncontroverted fact that Douglas signed the ATF form. These inconsistencies, while relatively slight, combined with a lack of corroboration from Defendant or Douglas, compare unfavorably to the corroborated and consistent testimony of the law enforcement witnesses on this issue, and the Court finds that the government has met it burden to show that Douglas consented to the search.

Ordinarily, voluntary consent to a search allows the state to search places and things normally protected by the Fourth and Fourteenth Amendments. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). For consent to effectively waive those protections, consent to search must not be the result of express or implied duress or coercion. *Id.* at 248-49. It is the government's burden to show consent was given freely and voluntarily. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997). The Ninth Circuit uses five factors to examine the voluntariness of consent:

> (1) Whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained.

8

*United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012).  No factor is dispositive and the Court must also consider the totality of the circumstances.  The fact that some of these factors are not met does not mean consent was involuntary.  *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995).  A review of these factors favors a finding that consent was voluntarily given.

Considering the first factor, seizure of a person occurs when, accounting for the situation surrounding the police conduct in its entirety, the conduct communicates to a reasonable person that they are not free to ignore the police and continue with their day.  *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004).  The Ninth Circuit has further determined several factors useful to identify whether an individual's liberty is restrained such that they are in custody:

> (1) The number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of their right to terminate the encounter.

*United States v. Brown*, 563 F.3d 410, 416 (9th Cir. 2009).  Here, a reasonable person would not believe that she was free to do as she pleased.  Six or more officers descended upon the scene and at least four officers entered the home to

9

handcuff Douglas. No weapons were alleged to have been brandished at her. However, the encounter occurred at a private residence, supporting a finding that Douglas was in custody. No facts were presented evidencing whether officers implied that compliance would be compelled or whether officers advised Douglas that she could terminate the encounter. This all favors a finding that Douglas was in custody when she was asked to consent.

Officers are not alleged to have drawn their weapons while asking Douglas for her consent. *Miranda* warnings were not supplied, but they were not required in such a circumstance because Douglas was not the subject of a custodial interrogation, so their absence weighs against neither party. *Russell*, 664 F.3d at 1281. Douglas was informed, repeatedly, that she could refuse consent and could withdraw her consent at any time, favoring a finding of voluntariness. Finally, officers did not tell Douglas they would simply obtain a warrant if she did not consent, further favoring the government's position.

Taken in totality, the Court recognizes several factors that lean toward finding consent was not freely given, but the Court also notes some mitigating circumstances. A fleet of officers descending on a private home and the forced detainment of the consentee is inherently coercive. *Orhorhaghe v. INS*, 38 F.3d 488, 494-95 (9th Cir. 1994). Law enforcement should always have forms on hand to ensure that a proper script is being followed and so individuals can read their

10

right to decline. There is no reason the form should be missing important details, such as a witness's signature and a description of what is to be searched, as are missing here. While those coercive factors are present in this instance, Douglas was removed from her handcuffs and the police vehicle prior to giving consent. Officers described their conversation with Douglas as pleasant and cooperative and stated many times that she was not required to consent and could decline, both before and during the search. While the Court is concerned about some of these factors, taken in its entirety, the Court finds that Douglas freely and voluntarily gave consent for her vehicle to be searched and therefore suppression of the evidence found within the Chevy is inappropriate.

B.  *The events of March 17, 2020 are not sufficiently factually linked or inextricably intertwined such that their inclusion should be admitted as Rule 404(b) evidence.*

Defendant argues that the March 17, 2020 incident at the Western Inn Motel is inadmissible as evidence of other unrelated criminal acts and seeks its exclusion. The government contends that under Rule 404 of the Federal Rules of Evidence, evidence of the March 17 incident qualifies as relevant because it is directly related to the next day's events and the conduct at issue is inextricably intertwined with the offense charged. The government argues that the events at the Western Inn Motel are direct evidence of Defendant's guilt, asserting that Lindell used one of the firearms discovered in the backpack to threaten David Kahn. The government

11

further asserts the events are temporally linked because officers arrested Lindell less than 24 hours after the events at the motel.

Rule 404 bars evidence of a crime, wrong, or other act presented to demonstrate a person's character and actions in conformity with that character. Fed. R. Evid. 404(b).  Evidence of crimes or wrongs may be admissible to prove motive, intent, or opportunity.  Fed. R. Evid. 404(b).  In a criminal case, the prosecution must articulate the permitted purpose of such evidence and supporting reasoning for offering it.  Fed. R. Evid. 404(b)(3)(B).  Lindell is charged with being a felon in possession of a firearm.  (Doc. 1).  The crime has three elements: (1) conviction of a crime with a term of imprisonment of one year or more; (2) possession of a firearm; (3) in a manner affecting interstate commerce.  18 U.S.C. §922(g)(1).  The government seeks to link Lindell's alleged brandishing of a pistol at the Western Inn Motel to one of the pistols found in Douglas's Chevy.

The government has not articulated sufficient facts connecting the offense charged to the events on March 17, 2020.  The government asserts that, because Defendant may have possessed the same weapon later found in the Chevy, the events are all part of the same ongoing crime.  This is incorrect in the Court's view.  The offense charged is a status and possession crime, and the government must prove that Lindell possessed a firearm on or about March 18, 2020.  If Lindell possessed a gun and threatened the Kahns the prior day, those crimes would be

entirely separate from the charged crime. The events are not inextricably intertwined. Approximately 15 hours elapsed between the alleged assault and Lindell's arrest. Officers were not in hot pursuit of Lindell during that period and it does not appear he was evading police. In fact, Lindell was apparently at his mother's house doing laundry. This demonstrates that the events are most properly viewed as separate incidents and separate criminal acts. The Court also notes that admission of such evidence may confuse the jury as to the crime charged and would be highly prejudicial. Because this evidence is not offered for a proper purpose under Rule 404(b), it shall be excluded.

C. *Evidence of the Defendant's probationary status is substantially more prejudicial than probative and therefore Defendant's motion in limine on that issue is granted.*

Federal Rule of Evidence 403 states that the court my exclude otherwise relevant evidence if the probative value of the evidence is substantially outweighed by a danger of unfair prejudice. Lindell's probationary status is relevant to explain why officers were able to find him so quickly. However, this relevance is limited because it is tangential to the crime charged. Exactly how officers were able to find Lindell is of limited use in determining whether he was a prohibited person in possession of a firearm. Conversely, conviction of a prior crime can be highly prejudicial because it tempts the jury to either convict a defendant based on past wrongs or to assume conformity with criminal character. Given the low probative

13

value of the evidence, the parties' stipulation that Lindell will admit to a prior

qualifying conviction, and the high risk of prejudice, the Court finds that evidence

regarding Lindell's probationary status shall be excluded and Lindell's motion on

those grounds shall be granted.

> D. *The parties have stipulated that Defendant will admit to a prior felony conviction and the Government will not seek to introduce the specifics of that conviction.*

At the December 4, 2020, hearing, the parties informed the Court that they

had reached an agreement stipulating that Lindell will admit that he has prior

qualifying felony convictions under the offense charged and that the government

will not seek to introduce further specifics of those convictions.  Therefore, a

ruling from the Court on this issue is no longer necessary and the motion is denied

as moot.

## III. Conclusion

For the reasons given above, Defendant has met the standards for exclusion

of testimony regarding the incident on March 17, 2020, and exclusion of evidence

of his probationary status.  Defendant has not met the burden to suppress evidence

obtained from the search of the Chevy Trailblazer. Therefore, Defendant's Motion

(Doc. 22) is GRANTED IN PART and DENIED IN PART.

DATED this $\underline{20}^{\text{th}}$ day of January, 2021.

SUSAN P. WATTERS
United States District Judge